1.)

FILED
2004 FEB 19 P 4: 15

Earl Bates
    v.
Warden Myers ET. AL.

Civil No. 3:02 CV 974 (AVC)(TPC)

Feb. 12, 2004

Plaintiff's Motion for Summary
Judgement

Pursuant to Rule 56 of the Federal Rules of Civil Procedure the plaintiff respectfully move for summary judgement. The plaintiff is a pro se litigant in this case that is before the court. The plaintiff was incarcerated at Northern Correctional Institution from the date of April 11, 1995 to the date of November 27, 2002. An while the plaintiff was confined at Northern Correctional Institution the defendants had a bad habit of dening prisoners there one hour of daily exercise five days a week. The plaintiff was confined in a restrictive housing unit, where the defendants used the excessive restraints of handcuffs, leg irons, and a tether chain to recreate a prisoner in the recreation yard. An on one sixteen hour day the correctional officers had to provide one hour of daily exercise to one hundredth inmate/prisoners per day, which is impossible. So everyday fourty prisoners would be denied one hour

cont. Page 2

of daily exercise per day. Which the defendants subjected certain prisoners to twenty four hour a day lock down. The plaintiff was one of the main prisoners that was being subjected to this cruel practice. An when the plaintiff filed line grievances and institutional requests to rectify the problem the defendant did nothing about the cruel practice. (see line grievances an requests attached)

When the plaintiff was confined at Northern Correctional Institution in the year of April 2001 to November 2002, he did not pose a threat to the security of the institution. The defendants were confining the plaintiff in a cruel harsh enivronment. The defendants refused to give the plaintiff an others one hour of daily exercise in violation of the law. (see Affidavits from Jason Pete an William Ramos)

The defendants counsel speak of allege incidents which have no material fact to this case. This case is about the motive of wrong doing, which the defendants committed unlawful acts. The defendants knew that they were breaking policies and they continued to do so, at the enjoyment of punishing the plaintiff.

The plaintiff claims money damages against the defendants in there individual capacities. The plaintiff seeks an injunction from the defendants in there official capacities, which these capacities are admited by law. The plaintiff admits that this civil complaint is different

Cont. Page 3

from the state claims that was settled December 15, 2000. The plaintiffs civil complaint is not the same complaint. The complaints are totally different. The violations of the present complaint were committed at a later date.

## Plaintiff's Memorandum of law In support of Motion for Summary Judgement

### Facts

Plaintiff brings this action under 42 U.S.C. §1983 against defendants Warden Myers and Capatain Faneuff. Plaintiff complains that during the time that I was confined at Northern Correctional Institution, the defendants denied me one hour of exercise five days a week. According to state law recreation is a entitlement for state prisoners. The harsh conditions the plaintiff was subjected to were physically and mentally harmful and did not serve a legitimate correctional purpose. Such made up restrictions were cruel, inhumane, and injurious to the plaintiff's wellbeing. The plaintiff on a daily basis was being denied one hour of exercise by overworked correctional officers. The defendants were punishing the plaintiff without a justifiable cause. The conditions complained of violated the Eighth Amendment that amounted to "unquestioned and serious deprivations of a basic need." The Supreme Court

Cont. Page 4

has listed basic needs as food, clothing, shelter, medical care, reasonable safety as well as warmth and exercise.

The plaintiff further states that exercise is one of the basic human needs that prison officials must provide for under the Eighth Amendment. Undue restrictions on prisoners' opportunities for physical exercise constitute cruel and unusual punishment in violation of the Eighth Amendment. Gilland v. Owens, 718 F. Supp 665, 685 (W.D. Tenn 1989) Toussaint v. McCarthy 597 F. Supp 1388, 1402, 1412 (n.D. Cal 1984) It is irrelevant that prisoners can do exercises in their cells, they are entitled to some relief from uninterrupted cell confinement. Courts have held that prisoners are constitutionally entitled to regular exercise outdoors. The Eighth Amendment prohibits infliction of cruel and unusual punishment. (see Correctional officer Lee Dickenson statement) This proscription forbids not only physically barbarous treatment but also punishments that involve the unnecessary and wanton infliction of pain or that are grossly disproportionate to the severity of the crime. Rhodes v. Chapman, 452 U.S. 337, 346 (1981). Smith v. Coughlin, 748 F.2d 783, 787 (2 Cir. 1984) Punishments totally without penological justification would constitute unnecessary and wanton infliction of pain. The defendants in this case possessed a "sufficiently culpable state of mind" associated with "the unnecessary and wanton infliction of pain." see Farmer v. Brennan 511 U.S. 825, 834 (1994) Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001)

Mr. Earl Bates #179696
50 Nunnawauk Road
Newtown, CT 06470

Certification

I hereby certify that a copy of the foregoing was mailed this __12__th day of February 2004,

United States District Court

915 Lafayette Blvd
Bridgeport, CT 06604

Assistant Attorney General
Ann E. Lynch
110 Sherman Street
Hartford, CT 06105

Sincerly
Earl Bates

# Inmate Grievance Form A, Level 1
## Connecticut Department of Correction

CN 9601
1-14-94

Inmate Name: Earl Bates
Inmate No. 129696
Housing Location: 2West 102
Date: 9-8-98

☑ Line Grievance   ☐ Line Emergency   ☐ Health Service Grievance   ☐ Health Emergency

IGP No. 141-98-618   T No.

1. Informal resolution. Attach a copy of Inmate Request Form (CN9602) containing the appropriate staff member's response, or indicate why the form is not attached: I sent inmate request forms to Unit Manager Captain Mangiafico, Captain Zacherwicks, Major Bradnan, Major Krajnialk, Major Mcdonald, an Warden Gomez. An the issue still has not been resolved.

2. Nature of grievance. Indicate the events and reasons that led you to file this grievance. Specify dates, places, personnel involved, and how you were affected. (If you need more space, use one 8-1/2-by 11-inch sheet of paper and attach to this form.) (Exercise) Since I been confined in Northern administration segregation phase(1), I have not been receiveing my one hour of proper exercise outside of my cell. Since I been in phase(1) I have written informal inmate requests to Unit Mangger Captain Mangiafico an other Northern officials complaing about the unit illegal procedures, an officers denieing me one hour of proper exercise outside of my houseing cell. I have not received

3. Action requested. Describe what action you want taken to remedy the grievance. I would like the mandated Department of Correction policies to be implicated in daily operations. I would also like my one hour of proper exercise to sustain an enhance my health.

Inmate Signature: Earl Bates

Remember: Your grievance must be filed within 30 days of the cause of the grievance or within 30 days of the date you became aware of the cause. You may appeal this decision within 5 days. Use Inmate Grievance Form B.

## FOR OFFICIAL USE ONLY
## LEVEL 1 REVIEW

Date Received: SEP 10 1998   Disposition: Denied   Date of Disposition: 9/24/98

Grievance Issue:

Reasons: Recreation provided is consistant with established agency policy and appropriate requisite safety and security measures.

Level - 1 Reviewer: Giovanny Gomez

# Inmate Grievance Form B, Levels 2 and 3
## Connecticut Department of Correction

CN 9601B
7-1-98

Inmate name: Earl Bates  
Inmate No. 139626  
Facility: Northern C.I.  
Housing unit: 2W-102  
Date: 9-30-98

☑ Line grievance  ☐ Line emergency  ☐ Health grievance  ☐ Health emergency

IGP no. .618  T no.

Use this form to appeal a Level-1 decision. Grievance Form A (for Level 1) and any attachments must accompany this form; no review will be undertaken if they do not accompany this form. Your appeal must be filed within 5 days of the Level-1 response; deposit it in the box for inmate grievances.

Appeal. I am appealing the Level-1 decision because I am in discordance with the level 1 decision because the line grievance issue is not compromised. The proper one hour of exercise that I am expressing in this grievance is not →

Inmate signature: Earl Bates  
Date: 9-30-98

### FOR OFFICIAL USE ONLY. LEVEL 2 REVIEW

Date received: 10/02/98  
Disposition: Rejected  
Date of disposition: 10/07/98

Reasons: Such a status decision remains an integral part of the classification process, & is not subject to appeal via this process.

Level-2 reviewer: [signature]

☐ This grievance may be appealed within 5 days to Level 3  
☒ This grievance may not be appealed to Level 3 (see A.D. 9.6, Sect. 17)

Appeal. I am appealing the Level-2 decision because

Inmate signature:  
Date:

Deposit your appeal in the box for inmate grievances.

### FOR OFFICIAL USE ONLY. LEVEL 3 REVIEW

Date received:  
Disposition:  
Date of disposition:

Reasons:

Level-3 reviewer:

## NORTHERN CORRECTIONAL INSTITUTION

## INMATE REQUEST FORM

Date: 10-2-00

PHASE: ①  II  III          EAST  or  Ⓦ          Cell # 212

Inmate Name: Earl Bates                              Number: 179696

Request: Issue: Exercise; Do to the policies that are being initiated I am not receiving my one hour of daily exercise with handcuffs, leg irons, and a tether chain connected. I would like my one hour of exercise without the restraints on behind my back. (cc. file request Capt. Faneuff, Maj. Coates, LT. Manely)
(Continue on back if necessary) (Thanks)
E.B.

Submitted to: _____ Date Received: _____

Acted on by: _____

OCT 4 2000

Action taken and/or response: Recreation, As well As, All movement within The Phase I AS unit is in full restraints. P/s Address The other recreation issue w/ the Unit manager

Date of Response to Inmate: 10/5/00

Signature of Staff Member: _____

C: Capt Faneuff
   Capt Butler

I 050

## NORTHERN CORRECTIONAL INSTITUTION

## INMATE REQUEST FORM

Date: 9-11-00

PHASE: (I)   II   III        EAST or (WEST)        Cell # 212

Inmate Name: Earl Bates                   Number: 179676

Request: Issue: Officail Conduct; On 9-11-00 at about 7:20 A.M. me an my cell partner Williams said yes for one hour of exercise to officer Deary an Leiwaski. At 12:30 p.m. officer Strogev an stewart refused to give me an my cell partner ave one hour of exercise. I would like these officers to stop →

(Continue on back if necessary)

Submitted to: _____    Date Received: _____

Acted on by: _____

Action taken and/or response: According to our activity sheet and after speaking with staff it is apparent that you refused recreation.

Date of Response to Inmate: _____

Signature of Staff Member: Cpt [signature] 9/14/00

NCI 050

# NORTHERN CORRECTIONAL INSTITUTION

## INMATE REQUEST FORM

Date: 9-27-00

PHASE: **I**  II  III     EAST or **WEST**     Cell # 212

Inmate Name: Earl Bates     Number: 129636

Request: Issue: Exercise; I am not receiving my one hour of daily exercise with the handcuffs, leg irons, and a tether chain behind my back in a secure recreation yard. I would like my one hour of proper exercise.

(Thanks)
E.B.

(Continue on back if necessary)

Submitted to: _____     Date Received: _____

Acted on by: _____

Action taken and/or response: We spoke on this. If you feel you were denied on a certain day then let me know. I will check into it.

Date of Response to Inmate: _____

Signature of Staff Member: Cpt H

9/29/00

NCI 050

# CONNECTICUT DEPARTMENT OF CORRECTION
## NORTHERN CORRECTIONAL INSTITUTION

### INMATE REQUEST FORM

Date: 1-25-02

HOUSING UNIT: (I)   II   III        EAST or (WEST)        Cell # 212
(Circle One)

Inmate Name: Earl Bates         Number: 129696

Request: Issue: Recreation, I am writing in concerns of receiving my one hour of proper exercise. I am experiencing physical problems going to recreation with handcuffs, leg irons, and a tether chain. I would like to participate in proper exercise programing.

(Continue on back if necessary)                    (thanks)
                                                    E.B.
Submitted to: _____  Date Received: 1/28/02

Acted on by: _____

Action taken and/or response: Mr. Bates as long as you are in Phase I that is as proper as it will get. Good behavior gets you up to Ph. 2 & 3 where you are more free.

Date of Response to Inmate: _____
Signature of Staff Member: Capt. P

NCI 050

affidavit

I Jason Pete am currently in the Connecticut department of corrections, at northern correctional institution, confined in administrative segregation unit, phase 1. Since being in the phase 1 part of administrative segregation, I have been forced to go to recreation in leg irons, handcuffs and a tether chain behind my back for one hour, which restricts me from properly exercising. I am being subjected to cruel and unusual punishment by northern officials who are implementing this unlawful and cruel policy. Due to this tatic that is being initiated my one hour of proper exercise is being denied.

I declare under penalty of perjury that the statement in this affidavit is true.

5-28-02
Date

_Jason Pete_
Signature

Subscribed and sworn to before me this 28th day of May 2002.

C.T.O Edwards Sr.
notary public

## Affidavit

I William Ramos, am currently a state prisoner in the department of correction at Northern Correctional Institution. I have been housed at Northern Correctional Institution for four months. Since I been confined in the administrative segregation phase 1 program, One hour of recreation has been non-existent. Upon going to recreation, I am being shackled with handcuffs, leg irons, and a tether chain behind my back. These restraints are preventing me from properly exercising. Upon being in the restraints of handcuffs, leg irons, and a tether chain for fifthteen minutes or more, my body starts to ache in pain. Pertaining to the uncomfortable position of the harmful restraint restriction, I am being punished when I go to recreation. By the Northern Officials enforcement of the unlawful policies, My one hour of exercise is being denied.

I declare under penalty an perjury that the statement in this affidavit is true:

May 22, 2002
Date

William Ramos #229333

Subscribed and sworn to before me this 28th day of May 2002.

C.T.a. Edwards II
W. Edwards II
Notary Public or Other Person
Authorized to administer Oath

*Witness Statement, Exhibit (A).*

6/16/99 getaway

Lee Dickenson didn't set out to write a book. Initially, he just needed to let off steam—and as a corrections officer, he often worked up a real head of that. In fact, this former naval officer was stressed to the breaking point. To make matters worse, he found himself unable to confide his feelings to anyone, not even his wife. That's when he started writing. Dickenson says the more he wrote, the sadder and angrier he became. Each time he put pen to paper he found himself documenting another incident of cruel indifference, blatant incompetence, or flagrant—even criminal, he says—disregard for the rules by staff and supervisors.

So, without planning to write a book, much less an exposé of the failings of the state's prison system, Dickenson nevertheless ended up with a rather damning manuscript. It took a long time for Dickenson to find a publisher but *The Sounding Tire: Voices Along the Razor Wire* was finally released Aug. 5 by California-based, Lost Coast Press.

The book offers a rare look inside the Connecticut prison system—rare because few system employees speak freely about it and inmates aren't often in a position to talk. Seen through Dickenson's sometimes sympathetic, unflinchingly honest eyes, prison life—even for people who punch out at the end of a shift—is debilitating.



COURIER PHOTO

Knowing not everyone would be thrilled with his portrayal of the state's prisons, Dickenson was careful to make sure the Department of Correction knew what was coming.

"I did not want to blindside the department," says Dickenson. "I took them down an unedited manuscript so if they wanted some form of rebuttal or to say, 'No you can't do this,' they could. I checked with the PR people and they said there's no problem."

Perhaps they never expected it to be published. Now that it's out on bookstore shelves, departmental spokesman Scott Semple has little to say about its accuracy because he says he's unfamiliar with the institutions Dickenson is writing about and besides, he only just got a copy of the book. Correction Commissioner John Armstrong, Semple says, wishes the author good luck, although he hasn't read the book yet, either. In other quarters, however, *The Sounding Tire* seems to be ruffling a few feathers.

"I've been getting a great deal of friction since the book came out," says Dickenson. "I encountered a phone call the other day from someone who said they wanted a copy of the book autographed before I got shot in the parking lot."

Dickenson says he doesn't know how serious the threat was, but he adds, "Not everybody's wrapped too tight." That's just one of the many lessons he has learned working in the prison system.

Dickenson describes the culture of life behind bars and although his is a corrections officer's point of view, there's still plenty of talk about "retribution," "snitches" and "beatdowns in the parking lot"—things you might expect if an inmate wrote the book.

Dickenson relates anecdotes about sex for drug exchanges between female inmates and other guards. He recalls a mishandled prison riot investigation. Then there was the time a corrections officer drove the getaway car in a prisoner's escape. Although all names have been changed, some incidents were too infamous to coverup when they happened.

Plenty of other stories he tells never leaked beyond the prison walls, however, and those come as a revelation. According to Dickenson, for instance, a Jennings Road jail warden had an unauthorized set of keys to the Hartford lock-up. "We argued for four days against those keys being made in violation of all the directives governing security and key control, and yet they were done anyway," says Dickenson.

It's incidents such as "The Great Key Fiasco" of 1994 that prompted him to write the book in the first place. "I'm not angry with the department. I'm angry with some of the things we do and some of the ways we treat our people. And that's basically my soap box," he says.

"We're all human, we all have weaknesses and we're all su-

high standards for myself and for the people I work with and I expect them to live up to those standards. There's no place in the department for someone who can't at least abide by the minimum standards set forth."

Dickenson has clearly lost all patience for the politics and what he calls the "old boy network," both of which he feels reward the unqualified with promotions and encourage flagrant disregard for the rules.

Dickenson's own personal "Waterloo" was an inmate named Paula Brown, a prisoner at Niantic in 1993. She came to Dickenson's attention when she slashed her wrists, but despite Dickenson's insistence that she be put in the mental health wing, the medical staff said it wasn't necessary. She was placed in segregation instead, where the guard didn't check on her until too late. She had hung herself with a makeshift noose.

Dickenson denounces the medical and mental health staff handling Brown's case as largely incompetent, and castigates the officer for being too lazy to follow procedure or investigate when other inmates warned him Brown was suicidal. But what he really can't forgive was the way everyone denied responsibility for the tragedy.

Brown's suicide, Dickenson believes, was preventable. That the state paid to settle a lawsuit later filed by the bereaved family lends credence to his opinion.

### Dickenson relates anecdotes about sex for drug exchanges between female inmates and other guards.

His bitterness is palpable on these pages and yet, amazingly, he is still working "the line" at Stanley J. Radgowski Correctional Center in Montville. Dickenson gets the feeling he's working at this far flung outpost because it's "out of sight, out of mind," as far as the department's top brass are concerned.

"I have enough time invested now that I'd lose a great deal of money if I left. It's a chore now, to stick it out, but I intend to finish my 20, if they'll let me," he says. "I have gained a lot of support from the line staff, from the officers and from some of my fellow supervisors who said, 'It's about time. Somebody had to do something.' The supervisory staff are a little reluctant to comment. If I've opened everybody up, I've opened me up."

Nor is Dickenson finished. He just dropped off the raw manuscript for his second book with the Department of Correction, and says he's working on a third. Nevertheless, he worries about possible retribution.

"I would be a fool not to be worried. My wife and I have been married 27 years and we talked this thing over long and hard. This was something I had to do," he explains. "I have that dream inside that maybe I can make a difference. I'm still naive enough to believe that maybe sometime in the next six years, the opportunity will present itself."